UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/13/17_

GABOR UJVARI and GT ART
CONSULTING LTD.,

                Plaintiffs,

    - against -

1STDIBS.COM, INC.,

                Defendant.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 2216 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       In this diversity action, Plaintiff Gabor Ujvari and Plaintiff GT Art Consulting

Ltd. assert claims against Defendant 1stdibs.com Inc. ("1stdibs") for breach of contract,

fraudulent misrepresentation, and negligent misrepresentation. (See Am. Cmplt. (Dkt. No. 18))

The parties entered into a series of consulting contracts, pursuant to which Plaintiffs agreed to

locate art and antique dealers who would pay a subscription fee to list their merchandise on

Defendant's online fine art and antique website. (See id.) Plaintiffs claim, inter alia, that

Defendant did not honor its promise to enter into a new consulting contract, and thereby deprived

Plaintiffs of an opportunity to exercise certain stock options, and to receive additional grants of

stock options.

       Defendant has moved to dismiss under Fed. R. Civ. P. 12(b)(1), 12(b)(3), and

12(b)(6), arguing that (1) the forum selection clause in the parties' June 2014 consulting contract

precludes Plaintiffs from maintaining an action in this District; and (2) the Amended Complaint

fails to state a claim. (See Notice of Motion (Dkt. No. 22); Def. Moving Br. (Dkt. No. 23) at 8-

9) For the reasons stated below, Defendant's motion to dismiss will be granted.

## BACKGROUND

### I. FACTS[1]

#### A. The Parties

Plaintiff Ujvari is a Europe-based art and antiques consultant. (See Am. Cmplt. (Dkt. No. 18) ¶¶ 7, 26) Ujvari serves as the president and sole employee and shareholder of GT Art Consulting Ltd., which is a United Kingdom limited liability company. (Id. ¶¶ 8-9) Ujvari lived and worked in Italy until July 2014, when he moved to the United Kingdom as a result of events at issue in this litigation. (See id. ¶¶ 7, 36, 40-41)

Defendant 1stdibs.com Inc. – a Delaware corporation with a principal place of business in New York – operates an online gallery for luxury items, including fine art and antiques. (See id. ¶¶ 10, 24, 26) Art and antique dealers pay a monthly subscription fee in order to have their merchandise listed on 1stdibs's website. (Id. ¶ 26)

In September 2012, 1stdibs acquired Online Galleries Ltd., which is a United Kingdom corporation that operates a "UK-based art and antiques portal." (Id. ¶¶ 12, 25) Defendant fully owns, operates, and controls Online Galleries and has the authority to, inter alia, hire and fire employees of Online Galleries. (Id. ¶¶ 11, 13) According to the Amended Complaint, 1stdibs and Online Galleries are "alter egos of one another." (Id. ¶¶ 16-18)

#### B. The July 2011 Consulting Contract

On July 22, 2011, 1stdibs retained Ujvari to serve as a "European Sales Consultant" and lead the company's expansion in Europe. (Id. ¶ 26; see also Furmansky Decl., Ex. 3 (July 2011 Contract) (Dkt. No. 24-3)) Pursuant to a "Contract of Consulting Services"

---

[1] The Court's factual statement is drawn from the Amended Complaint (Dkt. No. 18), the allegations of which are presumed true for purposes of resolving Defendant's motion to dismiss. See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

2

executed by Ujvari and 1stdibs (the "July 2011 Consulting Contract"),[2] 1stdibs agreed to pay Ujvari $10,000 per month in exchange for his services in locating and enlisting European art and antique dealers to subscribe to 1stdibs's online marketplace. (See Am. Cmplt. (Dkt. No. 18) ¶ 26; Furmansky Decl., Ex. 3 (July 2011 Contract) (Dkt. No. 24-3) at §§ 1, 2) The agreement provides for a three-year term, beginning on July 1, 2011 and ending on June 30, 2014. (Am. Cmplt. (Dkt. No. 18) ¶ 28; Furmansky Decl., Ex. 3 (July 2011 Contract) (Dkt. No. 24-3) at 2)[3]

On February 17, 2012, 1stdibs agreed to pay Ujvari an additional €500 commission for each entity that Ujvari persuaded to subscribe to Defendant's online marketplace (Am. Cmplt. (Dkt. No. 18) ¶ 28), and on February 13, 2013, 1stdibs granted Ujvari an option to purchase 15,000 shares of its common stock at a strike price of $1.25 per share. (Id. ¶ 57; see also Furmansky Decl., Ex. 8 (Stock Options) (Dkt. No. 24-12) at 2-9) The grant notice for these stock options – and subsequent grant notices – provide that the options "vest and become exercisable" in incremental installments, and it is a prerequisite for both the vesting of future option grants and the exercise of the options already vested that Ujvari "continue[] to have a Service Relationship with [1stdibs]." (See Furmansky Decl., Ex. 8 (Stock Options) (Dkt. No. 24-12) at 2)

## C. The November 2013 Consulting Contract

In October 2013, Carmine Bruno – Online Galleries' chief executive officer – contacted Ujvari about his employment arrangement with 1stdibs. (See Am. Cmplt. (Dkt. No. 18) ¶ 29) As explained above, 1stdibs acquired Online Galleries in September 2012 to serve as its "UK-based art and antiques portal." (Id. ¶¶ 12, 25) Bruno informed Ujvari that, pursuant to

---

[2] Although the parties executed the contract on July 22, 2011, the contract has an effective date of July 1, 2011. (See Furmansky Decl., Ex. 3 (July 2011 Contract) (Dkt. No. 24-3) at 2, 4)

[3] All citations in this Order reflect page numbers assigned by this District's Electronic Case Filing system.

3

1stdibs's new internal policy, all Europe-based employees and contractors would work under Online Galleries instead of 1stdibs. (Id. ¶ 29)

Bruno also told Ujvari that he would have greater job security with Online Galleries, because 1stdibs – as a New York based-company – "hires and fires without cause." (Id. ¶ 30) Bruno told Ujvari that, because Online Galleries is subject to British and European Union employment laws, it cannot terminate employees without cause and, moreover, must give two verbal warnings and two written warnings before firing an employee. (Id. ¶ 31) Ujvari claims that, based on these representations of greater job security, he agreed "to execute a new [consulting] agreement with Online Galleries." (Id.)

On November 21, 2013, Ujvari entered into a "Consultancy Agreement" with Online Galleries (the "November 2013 Consulting Contract").[4] (See Furmansky Decl., Ex. 4 (November 2013 Consulting Contract) (Dkt. No. 24-4)) Pursuant to this consulting contract, Ujvari agreed to "[r]efer new dealers in Europe" to the 1stdibs's online marketplace. In exchange, Ujvari would be paid €7,500 per month and a €500 commission "per new [dealer] account referred" to 1stdibs. (See id. at §§ 5.1, 8.1, Schedule 1) The agreement provides for a one-year term – from November 1, 2013 to December 31, 2014 – and states that Ujvari's "[a]ppointment will terminate automatically [on] the [latter] date." (Id. at §§ 3.1, 3.2) The agreement also permits either party "to terminate th[e] [a]greement earlier giving to the other not less than 30 days' prior written notice." (Id. at § 3.1) The agreement further provides that it constitutes "the entire agreement and understanding between the parties in respect of the subject matter of this Agreement." (Id. at § 21.2)

---

[4] Although the parties executed the contract on November 21, 2013, the contract has an effective date of November 1, 2013. (See Furmansky Decl., Ex. 4 (November 2013 Consulting Contract) (Dkt. No. 24-4) at 4)

4

The November 2013 Consulting Contract provides that it "shall be governed by and construed in accordance with Italian law," and that "[e]ach of the parties irrevocably submits for all purposes in connection with this [a]greement to the exclusive jurisdiction of the courts of Italy."[5] (Id. at § 21.9)

## D. 1stdibs and Online Galleries' Representations Concerning Ujvari's Long-Term Employment Prospects

In the months following the execution of the November 2013 Consulting Contract, Bruno allegedly made a series of representations concerning Ujvari's future with 1stdibs and Online Galleries. In January 2014, when Ujvari visited 1stdibs's United Kingdom office, Bruno told Ujvari that he would "lead the sales for 1stdibs . . . in Europe[ and] the United Kingdom," but that as a prerequisite for this position, Ujvari would be "required to change his residence [from Italy] to the United Kingdom." (Am. Cmplt. (Dkt. No. 18) ¶ 36)

In March 2014, Bruno told Ujvari that "there will be one day when [he] will be the Sales Director and [his] job will be to hire sales people in Europe and the United Kingdom, and educate, control and lead them as a sales team, and that [Ujvari] will not have to travel anymore." (Id. ¶ 37)

In a May 2, 2014 email to Ujvari, Bruno reiterated these oral statements. (Id. ¶ 38)

During a May 15, 2014 dinner, David Rosenblatt – CEO of 1stdibs – told Ujvari

(1) that Rosenblatt and 1stdibs were very excited about Ujvari signing up so many great dealers, and doing an excellent job [in] the field as European Sales Director; (2) that if Ujvari were to relocate his residence to the United Kingdom and work close to . . . Bruno, that it would be a smart idea, resulting in the company saving on expenses and increasing sales in [the] United Kingdom; and (3) that Ujvari has a long future with the company, and that Rosenblatt is going to give Ujvari more Stock Options every year.

---

[5] Ujvari lived and worked in Italy at the time he executed the November 2013 Consulting Contract. (See Am. Cmplt. (Dkt. No. 18) ¶ 36)

5

(Id. ¶ 39)[6]

Plaintiffs claim that these representations were made "with the intent to induce [Ujvari] to execute a new [consulting] agreement[,] . . . to believe that his employment with [1stdibs and Online Galleries] was . . . secure[,] . . . [and to continue] developing and expanding [1stdibs's] business while [1stdibs] was preparing to make a public stock offering " (Id. ¶¶ 36-37)

### E. The June 2014 Consulting Contract

As a result of Bruno and Rosenblatt's representations, Ujvari agreed to move to the United Kingdom and continue his consulting relationship with 1stdibs and Online Galleries. (See id. ¶¶ 40, 50)

The parties entered into a new consulting contract, which is dated June 1, 2014 (the "June 2014 Consulting Contract").[7] (See Furmansky Decl., Ex. 5 (June 2014 Contract) (Dkt. No. 24-7) at 4) The new agreement "amended" the November 2013 Consulting Contract (see Am. Cmplt. (Dkt. No. 18) ¶ 43) and includes the following changes. First, the named parties to the agreement are 1stdibs – rather than Online Galleries – and GT Art Consulting, Ujvari's company. (See Furmansky Decl., Ex. 5 (June 2014 Contract) (Dkt. No. 24-7) at 4) Second, the agreement provides for compensation to GT Art Consulting in the amount of £6,000

---

[6] On March 4, 2014, 1stdibs granted Ujvari an option to purchase 5,000 shares of its common stock. The strike price for these options has not been provided to the Court. On April 30, 2014, 1stdibs granted Ujvari the option to purchase an additional 5,000 shares of its common stock at a price of $1.29 per share. (Id. ¶¶ 58-59; see also Furmansky Decl., Ex. 8 (Stock Options) (Dkt. No. 24-12) at 10-15)

[7] Plaintiffs allege that the new agreement was executed "[i]n or around July of 2014," but "was back dated to June 1, 2014." (Am. Cmplt. (Dkt. No. 18) ¶¶ 42-43; see Furmansky Decl. Ex. 5 (June 2014 Contract) (Dkt. No. 24-9) at 6)

6

per month, plus a £400 commission for each new account signed.[8]  (Id. at § 8.1)  Third, the

agreement provides that it will be governed by English law, and that "[e]ach of the parties

irrevocably submits for all purposes in connection with this [a]greement to the exclusive

jurisdiction of the courts of England."  (Id. at § 21.9)

The June 2014 Consulting Contract provides for a half-year term, running from

June 1, 2014 to December 31, 2014, and permits either party "to terminate th[e] [a]greement

earlier giving to the other not less than 30 days' prior written notice."  (Id. at § 3)  The contract

further states that "[a]ll rights and obligations of the parties shall cease to have effect

immediately upon termination or expiry of this [a]greement," subject to certain exceptions.  (Id.

at § 13.3)

The June 2014 Consulting Contract does not explicitly terminate the November

2013 Consulting Contract, but it contains a provision stating that "[t]his Agreement sets out the

entire agreement and understanding between the parties in respect of the subject matter of this

Agreement."  (Id. at § 21.2)  The contract does not address Ujvari's move to the United Kingdom

or his long-term employment prospects with 1stdibs.

On June 1, 2014, 1stdibs granted Ujvari an option to purchase an additional

15,000 shares of its common stock.[9]  (Am. Cmplt. (Dkt. No. 18) ¶ 60)  On September 11, 2014,

1stdibs granted Ujvari an option to purchase 20,000 more shares of its common stock at a price

of $1.29 per share.  (Id. ¶ 61; Furmansky Decl., Ex. 8 (Dkt. No. 24-12) at 18-25)  As with the

prior stock option grants, these options "vest[ed] and [became] exercisable" incrementally, and

---

[8]  According to the Amended Complaint, 1stdibs also agreed to pay "an additional 3%
commission for any advertising sold by Ujvari in Europe and [the] United Kingdom."  (Am.
Cmplt. (Dkt. No. 18) ¶ 42)

[9]  The strike price for these options has not been provided to the Court.

7

included as a condition that Ujvari "continue[] to have a Service Relationship with [1stdibs]."

(Furmansky Decl., Ex. 8 (Dkt. No. 24-12) at 18)

### F. Ujvari Moves from Italy to the United Kingdom

Ujvari moved to the United Kingdom on July 7, 2014. (Am. Cmplt. (Dkt. No. 18)

¶ 41)

In November 2014, Ujvari asked Bruno to provide an employment reference in

connection with Ujvari's application to rent a home. (Id. ¶ 47) According to the Amended

Complaint, Bruno provided a written reference stating that:

- Ujvari[ had] full time employment with 1stdibs as a Consultant;
- Ujvari . . . ha[d] a base salary [of] £72,000 per annum;
- Ujvari's commission was £40,000 - £50,000 per annum;
- Ujvari's total income was £110,000 - £120,000 per annum;
- 1stdibs [had] approved GT Art Consulting Ltd.'s contract for 2015, and . . . signed the applicable contract in December of 2014;
- [through GT Art Consulting Ltd.,] 1stdibs [would] extend Ujvari's . . . contract through at least 2016 and/or 2017.

(Id. ¶ 48)

### G. The Proposed January 2015 Consulting Contract

In "late December of 2014," Bruno – acting on behalf of 1stdibs – sent Ujvari a

proposed consulting contract for the period from January 1, 2015 to December 31, 2015 (the

"Proposed January 2015 Consulting Contract"). (Id. ¶ 52; see also Furmansky Decl., Ex. 6

(Proposed January 2015 Contract) (Dkt. No. 24-10)) The proposed agreement – which again

names GT Art Consulting and 1stdibs as parties – contains most of the same provisions as the

June 2014 Consulting Contract, including a provision permitting either party to terminate the

contract on 30 days' prior notice, and a forum selection clause stating that "[e]ach of the parties

irrevocably submits for all purposes in connection with this [a]greement to the exclusive

jurisdiction of the courts of England." (Furmansky Decl., Ex. 6 (Proposed January 2015 Contract) (Dkt. No. 24-10) at §§ 3, 21.9)

The proposed agreement differs as to compensation, however, providing for a £3,333.33 monthly base salary, with a £400 commission for each new account signed and a 3% commission on advertising revenue secured by Ujvari. (Id. at § 8.1) The Amended Complaint alleges that Bruno told Ujvari that his "decision [concerning compensation] is final and if you don't like it you are free to go. You are not important anymore, because you built the system for 1stdibs and it is well established and works without you." (Am. Cmplt. (Dkt. No. 18) ¶ 53)

On January 7, 2015 – after the expiration of the June 2014 Consulting Contract – Bruno told Ujvari that 1stdibs's chief financial officer was finalizing the Proposed January 2015 Consulting Contract and expected that process to be completed by January 15, 2015. (Id. ¶ 54) Bruno "instructed [Ujvari] to make his 2015 travel plans [for the consulting business]," and Ujvari did so based on Bruno's representations. (Id.) Plaintiffs do not allege that Ujvari or GT Art Consulting ever signed the proposed agreement.

On January 16, 2015, Bruno informed Ujvari "that his contract was terminated." (Id. ¶ 55) That same day, 1stdibs sent a notice of termination to Ujvari stating:

> we hereby give you 30 days' notice that we are terminating the Consultancy Agreement between 1stdibs and GT Art [Consulting Ltd.] dated 1 January 2015 (the "Consultancy Agreement"). Accordingly, the Consultancy Agreement shall terminate on 15 February 2015 (the "Termination Date").

(Furmansky Decl., Ex. 7 (Notice of Termination) (Dkt. No. 24-11) at 2)

## II.   PROCEDURAL HISTORY

The Complaint was filed on March 24, 2016, and asserts claims for breach of contract, fraudulent misrepresentation, and negligent misrepresentation. (Dkt. No. 1) Plaintiffs seek an award of compensatory and punitive damages, including (1) $300,000 in lost stock

9

options to which Ujvari "would have been entitled . . . but for the unlawful termination and breach [of contract]"; and (2) $98,000 in moving and relocation expenses arising from Ujvari's reliance on Defendant's misrepresentations concerning his future employment with 1stdibs. (See id., ad damnum clause)

On November 16, 2016, Defendant moved to dismiss the Amended Complaint for (1) improper venue, pursuant to Rule 12(b)(1), 12(b)(3), and 12(b)(6), because the forum selection clause in the June 2014 Consulting Contract confers "exclusive jurisdiction [on] English . . . courts" (Def. Moving Br. (Dkt. No. 23) at 15-22); and (2) failure to state a claim, pursuant to Rule 12(b)(6). (Id. at 12-14, 23-32; see also Notice of Motion (Dkt. No. 22))

On August 18, 2017, Plaintiffs withdrew their claims for moving and relocation expenses. (Dkt. No. 29)

## DISCUSSION

Defendant claims that the Amended Complaint must be dismissed based on the forum selection clause contained in the parties' June 2014 Consulting Contract. (Def. Moving Br. (Dkt. No. 23) at 15)

## I.   MOTION TO DISMISS PREMISED ON FORUM SELECTION CLAUSE

### A.   Procedural Vehicle

The Second Circuit has stated that a forum selection clause may be enforced through a motion to dismiss. Such a motion may be premised on (1) lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), see AVC Nederland B.V. v. Atrium Inv. Partnership, 740 F.2d 148, 152 (2d Cir. 1984); (2) improper venue, pursuant to Fed. R. Civ. P. 12(b)(3), see Phillips v. Audio Active Ltd., 494 F.3d 378, 382 (2d Cir. 2007); or (3) failure to

10

state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), see Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V., 145 F.3d 505, 508 n. 6 (2d Cir. 1998).

More recently, the Supreme Court has instructed that generally "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens,"' rather than through application of Rule 12(b). Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 134 S. Ct. 568, 580 (2013). Atlantic Marine addressed a motion to dismiss for improper venue under Rule 12(b)(3), however, and the Court reserved decision on whether a "defendant in a breach-of-contract action should be able to obtain dismissal under Rule 12(b)(6) if the plaintiff files suit in a district other than the one specified in a valid forum-selection clause." Id. at 580.

Here, Defendant – in seeking to enforce the parties' forum selection clause – seeks relief under Rule 12(b)(1), 12(b)(3), or 12(b)(6). (See Def. Moving Br. (Dkt. No. 23) at 15 and 15 n.5) Although the Supreme Court's decision in Atlantic Marine makes clear that Rule 12(b)(3) is not the "proper procedural vehicle for enforcing a forum selection clause," see Martinez v. Bloomberg LP, 740 F.3d 211, 216 (2d Cir. 2014), "[b]ecause . . . Atlantic Marine merely clarified the procedural vehicle through which forum selection clauses are enforced and did not significantly alter the substantive analysis of the clauses," courts have construed motions to dismiss brought under Rule 12(b)(3) as proceeding instead under the forum non conveniens doctrine. See Amto, LLC v. Bedford Asset Mgmt., LLC, 168 F. Supp. 3d 556, 574 n.8 (S.D.N.Y. 2016) (construing motion to dismiss under Rule 12(b)(3) on the basis of forum selection clause as proceeding under forum non conveniens doctrine); Midamines SPRL Ltd. v. KBC Bank NV, No. 12 Civ. 8089 (RJS), 2014 WL 1116875, at *2 n.3 (S.D.N.Y. Mar. 18, 2014) (same); see also Martinez, 740 F.3d at 216-17 (reviewing district court's dismissal pursuant to

Rule 12(b)(3) through the lens of forum non conveniens). To the extent that Defendant seeks dismissal pursuant to the parties' forum selection clause, this Court construes Defendant's motion as proceeding under the doctrine of forum non conveniens.

In deciding a motion to dismiss for forum non conveniens, a district court "may rely on the pleadings and affidavits submitted in connection with the motion, but cannot resolve any disputed material fact in the movant's favor unless an evidentiary hearing is held." Allianz Glob. Corp. & Specialty v. Chiswick Bridge, No. 13 Civ. 7559 (RA), 2014 WL 6469027, at *2 (S.D.N.Y. Nov. 17, 2014) (citing Martinez, 740 F.3d at 216-17).

## B. Choice of Law

The June 2014 Consulting Contract provides that it "shall be governed by and construed in accordance with English law." (Furmansky Decl., Ex. 5 (June 2014 Contract) (Dkt. No. 24-7) at § 21.9) Accordingly, this Court must determine what role English law should play in determining the scope and enforceability of the forum selection clause contained in the June 2014 Consulting Contract. Martinez v. Bloomberg LP, 740 F.3d 211 (2d Cir. 2014), is instructive on this point.

In Martinez, plaintiff worked for Bloomberg in London, and his employment agreement stated that it "'shall be interpreted and construed in accordance with English law and any dispute arising hereunder shall be subject to the exclusive jurisdiction of the English courts.'" Id. at 215. Plaintiff brought suit in the Southern District of New York, alleging that Bloomberg had violated (1) the Americans with Disabilities Act, by discriminating against him on the basis of a perceived disability, and (2) the New York State Human Rights Law and the New York City Human Rights Law, by discriminating against him on the basis of his sexual orientation. Id. Relying on the forum selection clause, Bloomberg moved to dismiss for

12

improper venue pursuant to Fed. R. Civ. P. 12(b)(3), and the district court granted the motion.

Id. at 216.

On appeal, the Second Circuit began its analysis by acknowledging that, in

Atlantic Marine, the Supreme Court had held "that generally 'the appropriate way to enforce a

forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non

conveniens.'" Id. at 216 (quoting Atlantic Marine, 134 S. Ct. at 580). The court then addressed

the following question:

> Where a contract contains both a choice-of-law and a choice-of-forum clause, does
> federal law or the body of law specified in the choice-of-law clause govern the effect of
> the choice-of-forum clause in an action brought in a federal district court?

Id. at 217.

"In answering th[at] question, [the court] distinguish[ed] between the

interpretation of a forum selection clause and the enforceability of the clause." Id. (emphasis in

original). The court concluded that issues regarding enforceability are resolved under federal

law, while "interpretive questions" are resolved under the "body of law selected in an otherwise

valid choice-of-law clause." Id. at 217-18 (emphasis omitted).

A four-part analysis applies to motions to dismiss premised on a forum selection

clause, and this analysis includes both "interpretive questions" and questions that go to the

enforceability of the clause. A court considering such a motion must ask:

> (1) whether the clause was reasonably communicated to the party resisting enforcement;
> (2) whether the clause is mandatory or permissive, i.e., . . . whether the parties are
> required to bring any dispute to the designated forum or simply permitted to do so; and
> (3) whether the claims and parties involved in the suit are subject to the forum selection
> clause. If the forum clause was communicated to the resisting party, has mandatory force
> and covers the claims and parties involved in the dispute, it is presumptively enforceable.
> A party can overcome this presumption only by (4) making a sufficiently strong showing
> that enforcement would be unreasonable or unjust, or that the clause was invalid for such
> reasons as fraud or overreaching.

13

Id. at 217 (quoting Phillips, 494 F.3d at 383-84) (internal citations and quotation marks omitted).

Questions 1 and 4 above – which go to enforceability – are resolved under federal

law, while Questions 2 and 3 – which involve interpretation of a forum selection clause – are

generally resolved under the law designated in the parties' agreement:

> The overriding framework governing the effect of forum selection clauses in federal
> courts, therefore, is drawn from federal law. Furthermore, federal law should be used to
> determine whether an otherwise mandatory and applicable forum clause is enforceable
> under . . . step four in our analysis. In answering the interpretive questions posed by parts
> two and three of the four-part framework, however, we normally apply the body of law
> selected in an otherwise valid choice-of-law clause. Hence, if we are called upon to
> determine whether a particular forum selection clause is mandatory or permissive, or
> whether its scope encompasses the claims or parties involved in a certain suit, we apply
> the law contractually selected by the parties.

Id. at 217-18 (internal citations and quotation marks omitted) (emphasis in original).

Accordingly, with respect to the forum selection clause in the June 2014

Consulting Contract, the questions of whether the clause was reasonably communicated to

Plaintiffs, and whether the clause is ultimately enforceable, will be resolved under federal law,

while English law applies in determining whether the clause is mandatory and whether the

claims and parties in this litigation fall within the clause's scope.

"[E]ven where the contract at issue . . . contain[s] a choice-of-law clause,"

however, courts may "cite[] federal law in interpreting a forum selection clause" under certain

circumstances. Id. at 223 (citing Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714,

721 (2d Cir. 2013); John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs. Inc.,

22 F.3d 51, 53 (2d Cir. 1994); Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1363 (2d Cir. 1993)).

For example, in some cases in which a parties' agreement contains a choice-of-law provision

providing for the application of another nation's law, the parties nonetheless cite to federal law in

addressing the "interpretive questions" referenced above. "Just as parties are free, via a choice-

14

of-law clause, to select the law to govern the interpretation of a forum selection clause, nothing prevents the parties in litigation from choosing not to 'rely on any distinctive features of [the selected law] and [instead to] apply general contract law principles and federal precedent to discern the meaning and scope of the forum clause.'" Id. (quoting Phillips, 494 F.3d at 386). That is, "'parties by their acquiescence . . . may induce the trial court to assume that foreign law is similar to that of the forum,' with the result that a court does not err when it articulates its decision by reference to the law of the forum." Id. (quoting Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 53 (2d Cir. 1984)); see also Arial Techs., LLC v. Aerophile S.A., No. 14 Civ. 4435 (LAP), 2015 WL 1501115, at *3 (S.D.N.Y. Mar. 31, 2015) ("a court need not apply foreign law to interpret a forum selection clause unless the parties do so"; applying federal precedent to analyze scope of a forum selection clause where the defendants cited only federal law and the plaintiff cited no law on the issue).

Accordingly, this "Court will examine [English] law [only] where the parties rely on it." See Arial Techs., 2015 WL 1501115, at *3. Because Plaintiffs have not cited any law on the issue, and Defendant cites English law only in arguing that the claims in this litigation fall within the scope of the forum selection clause (see Def. Moving Br. (Dkt. No. 23) at 18-21), the Court relies on English law to interpret the scope of the forum selection clause and will otherwise rely on federal law in resolving the instant motion.

## C.    **Analysis**

In moving to dismiss the Amended Complaint, Defendant relies on the forum selection clause set forth in the June 2014 Consulting Contract, which is the parties' most recent agreement. (Def. Moving Br. (Dkt. No. 23) at 17)

15

## 1.    Whether the Clause Was Reasonably Communicated

At step one of the analysis, a court must determine whether the forum selection clause was "reasonably communicated to the part[ies] resisting enforcement." See Martinez, 740 F.3d at 217.

A forum selection clause may be deemed "reasonably communicated" where "[t]he clause at issue . . . appear[s] as a standard section in the main body of [an] [a]greement signed by [plaintiff] and is phrased in both clear and unambiguous language." Gasland Petroleum, Inc. v. Firestream Worldwide, Inc., No. 14 Civ. 597, 2015 WL 2074501, at *5 (N.D.N.Y. May 4, 2015); see also Leviton Mfg. Co., Inc. v. Reeve, 942 F. Supp. 2d 244, 264 (E.D.N.Y. 2013) (finding "no reason to believe that the clause was not reasonably communicated" where the parties "signed the agreement containing the clause and thus presumably had an opportunity to review its contents"); Magi XXI, Inc. v. Stato Della Citta Del Vaticano, 818 F. Supp. 2d 597, 604-05 (E.D.N.Y. 2011) ("A forum selection clause is reasonably communicated if it is phrased in clear and unambiguous language."); cf. Midamines SPRL Ltd., 2014 WL 1116875, at *3 ("A clause is reasonably communicated to a party where the party signs an agreement that explicitly directs the party to the clause.").

Here, the forum selection clause at issue states that "[e]ach of the parties irrevocably submits for all purposes in connection with this Agreement to the exclusive jurisdiction of the courts of England." (Furmansky Decl., Ex. 5 (June 2014 Consulting Contract) (Dkt. No. 24-9) at § 21.9(b))  The clause appears as a "standard section in the main body" of the agreement and is plainly "phrased in both clear and unambiguous language." See Gasland Petroleum, Inc., 2015 WL 2074501, at *5.  Although Ujvari is not himself a party to the agreement, he serves as "the President and sole employee and shareholder of GT Art

16

[Consulting]" (Am. Cmplt. (Dkt. No. 18) ¶ 9), and the agreement is "[e]xecuted as a Deed by GT Art Consulting Ltd. acting by Gabor Ujvari." (Furmansky Decl., Ex. 5 (June 2014 Consulting Contract) (Dkt. No. 24-9) at 6) Accordingly, the Court concludes that the forum selection clause in the June 2014 Consulting Contract was "reasonably communicated to the part[ies] resisting enforcement."

## 2. Whether the Clause Is Mandatory or Permissive

At step two of the analysis, a court must determine whether the forum selection clause is permissive or mandatory.

"Mandatory forum selection clauses . . . require that disputes must be brought in the designated forum, to the exclusion of all other fora where jurisdiction may also lie." Global Seafood Inc. v. Bantry Bay Mussels Ltd., 659 F.3d 221, 225 (2d Cir. 2011) (citation omitted) (emphasis in original). "A forum selection clause is considered mandatory where: (1) 'it confers exclusive jurisdiction on the designated forum' or (2) 'incorporates obligatory venue language.'" Id. (quoting Phillips, 494 F.3d at 386).

Here, Section 21.9(b) of the June 2014 Consulting Contract provides that "[e]ach of the parties irrevocably submits for all purposes in connection with this Agreement to the exclusive jurisdiction of the courts of England." (Furmansky Decl., Ex. 5 (June 2014 Consulting Contract) (Dkt. No. 24-9) at § 21.9(b)) "This clause is unquestionably mandatory, as it contains both language of exclusive jurisdiction and obligatory venue." Arial Techs., 2015 WL 1501115, at *4.

## 3. Whether Claims and Parties Are Subject to the Clause

At step three of the analysis, a court must determine whether the forum selection clause applies to the claims and parties in the action. In contending that Plaintiffs' claims for

17

breach of contract, fraudulent misrepresentation, and negligent misrepresentation fall within the scope of the forum selection clause, Defendant cites to English law. (Def. Moving Br. (Dkt. No. 23) at 18-21) Given the choice-of-law provision in the June 2014 Consulting Contract, and the Court's obligation "to examine [English] law where the parties rely on it," see Arial Techs., 2015 WL 1501115, at *3, this Court applies English law in determining whether Plaintiffs' claims fall within the scope of the forum selection clause.

In opposing Defendant's motion, Plaintiffs argue that the forum selection clause in the June 2014 Consulting Contract is "inapplicable" and "provide[s] no basis for dismissal." (Pltf. Opp. Br. (Dkt. No. 27) at 18) According to Plaintiffs, their contract claim is premised on the theory that Defendant breached an "implied contract,"[10] in which Defendant promised, inter alia, to renew Plaintiffs' consulting contract and reward Ujvari with "more Stock Options every year," "in exchange for [Ujvari] relocating from Italy to the UK."[11] (Id. at 7, 17-18; Am. Cmplt. (Dkt. No. 18) ¶¶ 39-40) Plaintiffs contend that the forum selection clause does not apply to their implied contract claim regarding the lost stock options, because this claim does not arise out of, and is not "in connection with," the June 2014 Consulting Contract. (See Pltf. Opp. Br. (Dkt. No. 27) at 7, 18)

Under English law, however, the "'proper approach to the construction of [forum selection] clauses . . . is to construe them widely and generously.'" Martinez, 740 F.3d at 225

---

[10] Plaintiffs' argument that they are suing on the basis of an "implied contract" contradicts the Amended Complaint, which discusses the written agreements between the parties at length, and which pleads that "Defendant has breached [its] multiple contracts described herein with plaintiffs by terminating plaintiffs' employment." (Am. Cmplt. (Dkt. No. 18) ¶ 63; see also id. ¶¶ 42-43)

[11] In the Amended Complaint, Plaintiffs also contend that – as a result of the "defendant's breach of contract" – Defendant is liable for $98,000 in expenses associated with Plaintiffs' move from Italy to the United Kingdom. (Am. Cmplt. (Dkt. No. 18) ¶ 64; see also Pltf. Opp. Br. (Dkt. No. 27) at 7, 17-18) Plaintiffs have since withdrawn their claims for moving and relocation expenses, however. (See Aug. 18, 2017 Order (Dkt. No. 29))

(quoting UBS AG v. HSH Nordbank AG, [2009] EWCA (Civ) 585, [82]). Accordingly, courts interpreting the scope of a forum selection clause under English law "'should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal.'" Id. at 224 (quoting Fili Shipping Co. Ltd. v. Premium Nafta Prods. Ltd., [2007] UKHL 40, [13]).[12] In this regard, "[t]he House of Lords (now the U.K. Supreme Court) . . . [has] held that courts should presume that [a forum selection] clause encompasses all disputes involving the relationship into which the contracting parties entered 'unless the language makes it clear that certain questions were intended to be excluded from the [selected] jurisdiction.'" Id. at 224-25 (quoting Fili Shipping, [2007] UKHL 40, [13]). Consistent with this broad construction, English courts have found that the "'words "arising out of" or "in connection with" apply to claims arising from pre-inception matters such as misrepresentation.'" Id. at 225 (quoting UBS AG, [2009] EWCA (Civ) 585, [82]).

The Second Circuit applied this broad construction in Martinez, which – as discussed above – addressed the scope of a forum selection clause in the context of an employment agreement governed by English law. Id. at 224. The court concluded that the forum selection clause in the employment agreement – which covered claims "arising out of" the contract – encompassed plaintiff's employment discrimination claims, even though such claims are "statutory tort[s]" under English law. See id. at 224-26. The court rejected plaintiff's argument that the "forum selection clause only encompasses breach of contract claims," because that was "precisely the proposition that the House of Lords rejected in the [Fili Shipping] case."

---

[12] Although Fili Shipping Co. addresses an arbitration clause, the Second Circuit has noted that the "decision refers broadly to the interpretation of 'jurisdiction clauses,'" and that "English courts have repeatedly applied the holding . . . to cases involving forum selection clauses." Martinez, 740 F.3d at 225.

19

Id. at 226. The Second Circuit also cited an English court's cautionary warning that "[t]he scope of a forum selection clause does not turn on 'whether an ingenious pleader could frame a cause of action without actually mentioning the . . . Agreement.'" Id. at 227 (quoting Skype Technologies SA v. Joltid Ltd., [2009] EWHC (Ch) 2783, [19]).

Given these English precedents, and the Second Circuit's treatment of these cases in Martinez, the Court concludes that the forum selection clause in the June 2014 Consulting Contract encompasses Plaintiffs' breach of contract and misrepresentation claims.

The clause at issue confers exclusive jurisdiction on English courts to resolve disputes arising "in connection with" the June 2014 Consulting Contract. (See Furmansky Decl., Ex. 5 (June 2014 Consulting Contract) (Dkt. No. 24-9) at § 21.9(b)) The gravamen of Plaintiffs' claims is that Defendant made – and later reneged on – promises to give Ujvari a new consulting contract in 2015 and more stock options every year, in exchange for his entering into the June 2014 Consulting Contract and relocating to England. (See Am. Cmplt. (Dkt. No. 18) ¶¶ 35-40, 48, 50-51) Accordingly, Plaintiffs' claims plainly "involve[e] the [business] relationship into which the contracting parties entered," Martinez, 740 F.3d at 224-25, and representations allegedly made by Defendant prior to entering, and during the term of, the June 2014 Consulting Contract. Such claims also clearly arise "in connection with" the agreement, and implicate provisions of the agreement, including its merger and integration clause. (See Furmansky Decl., Ex. 5 (June 2014 Consulting Contract) (Dkt. No. 24-9) at § 21.2 (providing that "[t]his Agreement sets out the entire agreement and understanding between the parties in respect of the subject matter of this Agreement") See also Martinez, 740 F.3d at 225 (recognizing that English courts interpret forum selection clauses containing the words "in connection with" as covering "pre-inception matters such as misrepresentation").

This Court concludes that the forum selection clause in the June 2014 Consulting Contract encompasses Plaintiff's claims.

This Court further concludes that Plaintiffs are subject to the clause.[13] There is no doubt that Plaintiff GT Art Consulting is subject to the clause, because it is a party to the June 2014 Consulting Contract and executed the agreement. (See Furmansky Decl., Ex. 5 (June 2014 Consulting Contract) (Dkt. No. 24-7) at 4; id. (Dkt. No. 24-9) at 6)

Moreover, while Plaintiff Ujvari is not named as a party to the contract, he nonetheless is subject to its forum selection clause. "It is well-established that forum-selection clauses are enforceable not only against signatories but also against non-signatories that are either successors-in-interest or 'closely related' to a signatory." Midamines SPRL Ltd., 2014 WL 1116875, at *5 (citing Magi XXI, Inc., 714 F.3d at 722-23; Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 701 (2d Cir. 2009)). "Courts . . . have found non-signatories to be 'closely related' where their 'interests are completely derivative of and directly related to, if not predicated upon the signatory party's interests or conduct.'" Id. (quoting Metro-Goldwyn-Mayer Studios Inc. v. Canal Distribution S.A.S., 07 Civ. 2918 (DAB), 2010 WL 537583, at *5 (S.D.N.Y. Feb. 9, 2010)).

The touchstone for determining whether a non-signatory is bound by a forum selection clause is whether "enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound." Metro-Goldwyn-Mayer Studios Inc., 2010 WL 537583, at *5 (citing Direct Mail Prod. Servs. Ltd. v. MBNA Corp., No. 99 Civ. 10550 (SHS), 2000 WL 1277597, *3 (S.D.N.Y. Sept. 7, 2000)). "Applying

---

[13] Because neither side cites English law with respect to whether the parties are covered by the forum selection clause, this Court relies on federal law to resolve the issue. See Arial Techs., 2015 WL 1501115, at *3. ("The Court will examine [English] law [only] where the parties rely on it.").

21

this standard, courts have enforced forum-selection clauses against non-signatory officers and directors of signatory corporations." Midamines SPRL Ltd., 2014 WL 1116875, at *5 (collecting cases). This Court concludes that Ujvari – who serves as "the President and sole employee and shareholder of GT Art [Consulting]," and who is the true party-in-interest for purposes of the consulting contracts – is "closely related" to GT Art Consulting and therefore properly subject to the forum selection clause.

*    *    *    *

Because the forum selection clause in the June 2014 Consulting Contract "was communicated to the resisting part[ies], has mandatory force[,] and covers the claims and parties involved in th[is] dispute, [the clause] is presumptively enforceable." Martinez, 740 F.3d at 217.

### 4.     Whether Plaintiffs Have Rebutted the Presumption of Enforceability

At step four of the analysis, a court must consider whether the resisting party has overcome the presumption of enforceability by showing that enforcement "would be unreasonable or unjust," or that the clause is "invalid for such reasons as fraud or overreaching." Id. There is nothing in the Amended Complaint or in the parties' briefs suggesting that Defendant secured the forum selection clause through fraud or overreaching. Moreover, there is no evidence that enforcement of the clause would be unreasonable or unjust. Plaintiff GT Art Consulting is a limited liability company organized under the laws of the United Kingdom, and Plaintiff Ujvari resides in the United Kingdom and Italy. (See Am. Cmplt. (Dkt. No. 18) ¶¶ 7-9) Moreover, Plaintiffs claim that they relocated to the United Kingdom because of Defendant's representations concerning the long-term prospects of, and compensation for, UK-based employment.

The Court concludes that Plaintiffs have not rebutted the presumption of

enforceability, and further concludes that the forum selection clause in the June 2014 Consulting

Contract is valid and enforceable. Defendant's motion to dismiss under the doctrine of forum

non conveniens will be granted.[14]

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is granted. The

Clerk of the Court is directed to terminate the motion (Dkt. No. 22) and to close this case.

Dated: New York, New York
September 13, 2017                    SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[14] Because the Court grants Defendant's motion to dismiss based on the forum selection clause, it does not reach Defendant's alternative arguments premised on Fed. R. Civ. P. 12(b)(6).